**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

MARVANA F. HODGES,                    )
                                      )
                    Plaintiff,        )
                                      )
v.                                    )          No.  07-CV-428-SAJ
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )
Administration,                       )
                                      )
                    Defendant.        )

**OPINION AND ORDER[1]**

Pursuant to 42 U.S.C. § 405(g), Marvana F. Hodges ("Plaintiff"), appeals the

decision of the Commissioner denying her disability insurance and supplemental security

income benefits under Titles I and XVI of the Social Security Act.  Plaintiff alleges that the

ALJ erred as a matter of law in failing to make a proper determination at steps 2, 3 and 5

of the sequential evaluation process, to fully and fairly develop the record, and to make a

proper credibility determination.  For the reasons discussed below, the Court hereby

reverses and remands the Commissioner's decision for further proceedings consistent with

this opinion.

**I.  FACTUAL AND PROCEDURAL HISTORY**

Plaintiff was born on March 29, 1956; therefore, she was considered an individual

closely approaching advanced age at the time of the administrative hearing. [R. 71].  She

has a general equivalency diploma (GED) and attended college [R. 94].  She worked as

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

a stacker/packer, home health aide, cashier, machine operator, and manager of video/liquor store. [R. 21, 90, 790-91].

Plaintiff alleges that several impairments prevent her from performing substantial gainful activity.  She has a progressive history of insulin-dependent diabetes mellitus, treated  initially with oral medications, and then insulin. [R. 184, 196] .  Plaintiff alleged she has poor circulation, numbness and chronic pain in her feet from her diabetes. [R. 269]. Although Plaintiff complained of tingling and numbness in her hands, an EMG performed on February 21, 2005, showed normal results. [R. 279].  In September 2006, Dr. Sri Reddy, M.D., found absent ankle reflexes and decreased sensation to touch in Plaintiff's feet. [R. 603].

At the Commissioner's request, Dr. Reddy conducted two consultative examinations of Plaintiff.  In the first examination on April 2, 2005, Plaintiff complained of pain in her neck, low back, and bilateral knees.  Dr. Reddy found normal, but painful, range of motion in Plaintiff's back and neck.  He found diminished range of motion and pain in both knees, but more on the right knee with swelling, while the left knee evidenced crepitus. [R. 282].  In the second examination on September 19, 2006, Dr. Reddy found tenderness and crepitus in both knees, and painful range of motion in Plaintiff's neck. [R. 603-04].  X-rays performed on September 19, 2006, revealed minimal AC joint hypertrophic arthropathy in the right shoulder and mild AC joint hypertrophic arthropathy with spurring in the left shoulder.  Right knee x-rays performed the same day revealed multi-compartment degenerative changes and severe osteoarthritis of the anterior compartment; left knee x-rays showed osteoarthritic changes of the lateral and anterior compartments, with calcifications and/or "loose bodies" in that joint. [R. 600-01].

2

The medical record also reflects a progressive weight gain, to the point Plaintiff was diagnosed as "morbidly obese." [R. 254].  In May 2003, she weighed 238 pounds. [R. 197]. Plaintiff weighed 264 pounds in March 2005. [R. 281].   In September 2006, Plaintiff weighed 252 pounds. [R. 602].

Dr. Reddy completed a "Physical Medical Source Statement" on September 19, 2006, finding that Plaintiff could continuously sit for eight hours and stand and/or walk for four hours in a work day.  Dr. Reddy limited Plaintiff to lifting and carrying up to twenty pounds occasionally.  He restricted her to no crawling, but found she could frequently reach and occasionally bend, squat, and climb.  Dr. Reddy based these limitations primarily on Plaintiff's obesity and noted the osteoarthritis in her knees. [R. 608-09].

Plaintiff also alleges mental impairments of depression and anxiety affect her ability to function.  On May 30, 2003, Plaintiff reported that her depression made her want to sleep "all the time." [R. 182].  Plaintiff stopped taking prescribed anti-depressant medication because she did not like its side effects. [R. 196.] On October 2004, Plaintiff was referred to the Tulsa Center for Behavioral Health, with complaints of insomnia with nightmares and irritability two months after her involvement in a  hostage situation where she witnessed the death of two friends. [R. 237, 258, 293].

Dr. John Hickman, Ph.D., examined Plaintiff at the request of the Commissioner on February 7, 2005.  Dr. Hickman found Plaintiff's speech "loud and rapid" and occasionally unintelligible, noting that she appeared to have difficulty in modulating the volume and tone of her speech.  Plaintiff described depressive episodes during which she wanted to sleep all the time, as well as manic episodes in which she did not sleep for days.  Plaintiff described feeling anxious "most of the time," having feelings of helplessness and

3

hopelessness, and experiencing panic attacks. [R. 270].  Dr. Hickman's testing revealed Plaintiff had no difficulty in maintaining concentration, but that she had low average general memory and average working memory.  Dr. Hickman noted Plaintiff showed moderate anxiety and depression with limited insight.  He found that she tended to focus her psychological discomfort on somatic complaints, and diagnosed her with a "pain syndrome"[2/] in addition to bipolar disorder, features of a histrionic personality disorder, and a history of polysubstance abuse.  Dr. Hickman concluded that Plaintiff had a "psychological component to her perception of pain and disability that has functional and secondary gain that is unlikely to change" her functioning in the near future.  [R. 273].  On the Mental Residual Functional Assessment form, Dr. Hickman indicated a "moderate" limitation in Plaintiff's ability to work in coordination with, or proximity to, others without being distracted by them. [R. 275].

Dr. Minor Gordon, Ph.D.,  examined Plaintiff at the request of the Commissioner on December 15, 2005.  From psychological testing, Dr. Gordon concluded Plaintiff had a "moderate level of depression, which. . . should not preclude her from gainful employment" and she "should be able to perform some type of routine or repetitive tasks on a regular basis." He diagnosed Plaintiff with bipolar disorder and histrionic personality traits. [R. 522]. Dr. Gordon found Plaintiff had a "moderate" limitation in her ability to accept instructions and respond appropriately to criticism from supervisors. [R. 525].

---

[2/]   Dr. Hickman specifically diagnosed Plaintiff with a "pain syndrome associated with both psychological factors and a general medical condition." [R. 273].  In that type of pain syndrome, "both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 503 (4th ed. Text Revision 2000).

Plaintiff has a history of alcohol and drug abuse. She admitted to being an alcoholic, but stated that she quit drinking in 1995. [R. 741].   She has a history of three hospitalizations for drug-related overdoses. Plaintiff was admitted to St. John Medical Center's emergency room in October 2001 for a cocaine and heroin overdose. [R. 341-42]. In December 2004, she was admitted to the emergency room at Tulsa Regional Medical Center for an overdose of methadone, amphetamines and other medications, which she later accused her boyfriend of administering to her without her knowledge. [R. 254, 257, 415].  Plaintiff was admitted for a week-long emergency detention at the Tulsa Center for Behavioral Health in March 2005 after an overdose of methadone; Plaintiff claimed her boyfriend gave this to her without her knowledge, and that  she was not making a suicide attempt. [R. 423]  On admission, she was described as disheveled, tearful and unhappy, with manic behavior, distracted concentration, poor judgment and reliability, and lacking insight. [R. 401].   Plaintiff was discharged with her bipolar symptoms stabilized on medication. [R. 402].

Plaintiff filed her application for Title XVI Supplemental Security Income benefits on March 6, 2003. [R. 71].  She was denied benefits at the initial and reconsideration levels [R. 50-52, 54-55] and filed a timely Request for Hearing. [R. 56].  On February 8, 2005, Plaintiff filed an application for Title II Disability Insurance benefits, alleging a disability onset date of January 1, 1997.[3/] [R. 81-82].  Her Title II application was "escalated" through the disability consideration process to be heard with her Title XVI application pending

---

[3/]   Plaintiff alleged an earlier onset date on her Title II application, because she was insured for Title II benefits only until June 30, 2001. [R. 123]. To prove entitlement to Title II benefits, Plaintiff must show that she became disabled before her Title II insured status lapsed on June 30, 2001.

before an Administrative Law Judge ("ALJ").  [R. 78].  ALJ Jeffrey S. Wolfe initially held a

hearing on November 14, 2004 [*see* R. 696-705], but postponed the hearing in order to

obtain consultative examinations and x-rays, and to allow Plaintiff to obtain new

representation. [R. 702-05].  ALJ Gene M. Kelly held a second hearing on July 28, 2005

[*see* R. 707-52], but continued the hearing when the medical expert stated he could not

render an opinion on the materiality of Plaintiff's drug and alcohol use, and Plaintiff's

attorney asked for time to obtain more evidence on that issue. [R. 745-49].  ALJ Kelly then

held a third hearing on March 8, 2006 [*see* R. 694-799], and issued a denial decision on

January 19, 2007. [R. 17-30].  Plaintiff filed a Request for Review with the Appeals Council,

but the Appeals Council denied her request on June 15, 2007. [R. 8-10].  She now seeks

judicial review.

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Disability under the Social Security

Act is defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> which can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less than
> 12 months; . . . .

42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A).  A claimant is disabled under the

Social Security Act only if her

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy, . . . .

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).[4/]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will "neither reweigh the evidence nor substitute its judgment for that of the Commissioner."  *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000); *see Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750.

---

[4/] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510, 416.910 and 404.1572, 416.972).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. §§ 404.1521, 416.972.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

"The finding of the Secretary[5/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.  This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that the record showed "medical findings" of the following impairments: insulin dependent diabetes, depression, anxiety, bipolar disorder, substance abuse, "vision problems," and "pain in hands, wrists, neck, back, knee, feet, shoulder, and legs."  He found these impairments "could place substantial limitation" on Plaintiff's ability to perform basic work activities, so that she had a "severe impairment by Social Security definition."  [R. 22].  The ALJ also found that Plaintiff had several impairments, including "high blood pressure, reflux, kidneys, Hepatitis C, Liver and obesity," which the ALJ concluded were non-severe.  *Id.*  The ALJ determined that Plaintiff did not have an

---

[5/]  Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296.  For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id.*  The ALJ assessed Plaintiff's residual functional capacity ("RFC") as permitting her to lift and/or carry up to 20 pounds; stand and/or walk about 6 hours in an 8-hour workday, at 30-minute intervals; sit for 6 hours out of an 8-hour work day at one hour intervals; occasionally climb, bend, stoop, crouch, kneel, operate foot controls with right lower extremity; occasionally reach overhead; and occasionally twist and nod her head.  The ALJ also found Plaintiff had slight limitations in fingering, feeling, and gripping, required low noise levels, and was unable to squat, work on rough, uneven surfaces, at unprotected heights, with fast/dangerous machinery, or in cold and damp work environments. [R. 22-23].  The ALJ found Plaintiff could not perform her past relevant work. [R. 27].   After considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were other jobs existing in significant numbers in the national economy that Plaintiff could have performed during the relevant time period. [R. 27-28].  Accordingly, the ALJ concluded that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of his decision. [R. 28].

## IV.  REVIEW

### A.    The ALJ's Step Two Conclusions

#### 1.    Obesity.

Plaintiff first argues that the ALJ erred in failing to discuss limitations associated with her obesity.  The ALJ did not give any reason in his decision for finding Plaintiff's obesity was  a "non-severe" impairment at Step Two.   Although the ALJ apparently adopted many

of the postural limitations Dr. Reddy indicated in the "Physical Medical Source Statement"

he completed on September 19, 2006, the ALJ failed to mention in his decision that Dr.

Reddy identified Plaintiff's "morbid obesity" as "primarily" causing many of those postural

limitations. [R. 609].  The ALJ failed to reconcile his reliance on Dr. Reddy's limitations

based on "morbid obesity" with his finding that Plaintiff's obesity was a non-severe

impairment. [R. 22].  "A determination that an individual's impairment is not severe requires

a careful evaluation of the medical findings that describe the impairment(s) (i.e, the

objective medical evidence and any impairment-related symptoms), and an informed

judgment about the limitations and restrictions the impairment(s) and related symptom(s)

impose on the individual's physical and mental ability to do basic work activities." *Policy*

*Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms*

*in Determining Whether a Medically Determinable Impairment is Severe,"* SSR 96-3p,

1996 WL 374181 at *2 (S.S.A. July 2, 1996).[6/] The ALJ's decision does not demonstrate

that he made the required "careful evaluation" or exercised an "informed judgment" about

the functional effects of Plaintiff's obesity.  The ALJ failed to evaluate Plaintiff's testimony,

which was consistent with Dr. Reddy's assessment, that her weight affected her joints, and

specifically her knees, ankles and hips. [R. 737-38].

Social Security Ruling 02-1p states that the ALJ "will . . . consider the effects of any

symptoms (such as pain or fatigue) that could limit functioning" and "do an individualized

assessment of the impact of obesity on an individual's functioning when deciding whether

---

[6/]   Although Social Security rulings do not carry the force of law, they are generally entitled to
deference because "they constitute the Social Security Administration's interpretations of its
own regulations and the statute which it administers."  *Walker v. Sec'y of Health & Human
Servs.*, 943 F.2d 1257, 1259-60 (10th Cir. 1991).

the impairment is severe." *Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity*, SSR 02-1p, 2000 WL 628049 at *4 (S.S.A. September 12, 2002). The ALJ failed to identify the effects of any symptoms that he attributed to Plaintiff's obesity and failed to demonstrate in his decision that he made the individualized assessment of Plaintiff's obesity's impact on her functioning at Step Two.  The ALJ's decision thus fails to show that he complied with Ruling 02-1p in his decision.

### 2.    Pain Syndrome.

From his consultative examination performed on February 7, 2005 at the request of the Commissioner,  Dr. John Hickman, Ph.D., concluded that Plaintiff tended to focus her psychological discomfort on somatic complaints, and diagnosed her with "pain syndrome associated with both psychological factors and a general medical condition" in addition to bipolar disorder. [R. 273].   Plaintiff argues that the ALJ erred in failing to address the diagnosed pain syndrome at Step Two, and at subsequent steps of the sequential evaluation process.

In response, Defendant contends that "after a claimant clears the step two preliminary hurdle, the classification of an impairment as severe or non-severe carries no legal significance " as the regulations require the ALJ to consider the functional effects of both severe and non-severe impairments in assessing RFC.  As support for this contention, the Commissioner cites an unpublished Tenth Circuit Order and Judgment, *Stokes v. Astrue*, No. 07-5046, 2008 WL 1766788 (10th Cir. April 18, 2008), for holding that the ALJ's failure to reference a claimant's pain disorder at step two was not reversible error. [Resp. Br. Dkt. #15 at 2].  In *Stokes*, the Tenth Circuit stated that "once the ALJ finds the claimant has a medically severe impairment or combination of impairments, he or she is required

to 'consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity.'" *Id.* at **2 (quoting 20 C.F.R. §§ 404.1545(e), 416.945(e)). The Tenth Circuit concluded that the failure to mention the claimant's pain disorder at Step Two "by itself, does not constitute reversible error." *Id.* at **2.

The *Stokes* decision appears to view the ALJ's RFC assessment at Steps Four and Five as a "safety net" that will catch the ALJ's errors at Step Two.  Such a view, however, is at odds with the Circuit's published decisions that must be accorded precedential weight. In *Salazar v. Barnhart*, 468 F.3d 615 (10th Cir. 2006), the Tenth Circuit explicitly stated,

> we agree[] that the ALJ misapplied the law when he failed to consider her borderline personality disorder in his disability determination.  It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less.  *See, e.g., 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 416.920(a), 416.923, 416.945.* Further, the failure to consider all of the impairments is reversible error.

*Salazar,* 468 F.3d at 621*.*

The *Stokes* decision did not indicate what consequences for reversal would follow if, in his RFC assessment, the ALJ did not make the required consideration of the limiting effects of all the impairments.  In his decision, <u>after</u> making his RFC assessment, the ALJ mentioned Dr. Hickman's examination and diagnosis of pain syndrome, but he failed to indicate what limiting effects he considered related to that specific mental impairment in assessing Plaintiff's RFC. [R. 23].  The ALJ's decision fails to indicate whether he considered the pain syndrome either singly, or in combination with Plaintiff's other "severe" and non-severe impairments in assessing Plaintiff's RFC.  The ALJ thus failed to provide the "safety net" consideration of the diagnosed pain syndrome that the *Stokes* decision

contemplated would be made.  Accordingly, the ALJ committed reversible error in failing to assess the diagnosed pain syndrome and its limiting effects at all steps in the sequential evaluation process.

The ALJ's failure to address the pain syndrome in his RFC assessment is also contrary to the Commissioner's guidelines for assessing RFC.  Social Security Ruling 96-8p requires the ALJ to include in his RFC assessment "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . .  and nonmedical evidence" and to "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, at *7 (S.S.A. July 2, 1996).  In discussing the medical and nonmedical evidence he considered in making his RFC t assessment, the ALJ did not address the diagnosed pain syndrome, or identify any functional limitations related to that syndrome, either singly or in combination with Plaintiff's other impairments.

The ALJ's failure to "to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."  *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984).  The Court's review of the ALJ's decision indicates the ALJ failed to follow the necessary legal principles at Step Two in evaluating the severity of Plaintiff's obesity and pain syndrome.  Accordingly, the ALJ must consider the functional effects of those two impairments on remand, with the appropriate discussion at Step Two and subsequent steps of the sequential evaluation process.

**B.     The ALJ's Step Three Conclusion**

13

Although Plaintiff's argument on this point attributes error to the ALJ at Step Three, it is more properly a Step Two argument, in that the regulations require the ALJ to make the severity finding for mental impairments at that Step of the sequential evaluation process and then apply it at Step Three.  *See*, 20 C.F.R. §§ 404.1520a(d); 416.920a(d).

Plaintiff argues that the ALJ erred in failing to assess the severity of her mental impairments in accordance with the "special technique" set forth in the applicable regulations.  The procedure or "technique" for evaluating a mental impairment is outlined at 20 C.F.R. §§ 404.1520a, 416.920a and the Listing of Impairments.  The procedure first requires the Commissioner to evaluate a claimant's "symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1); 416.920a(b)(1).  The Commissioner "must then rate the degree of functional limitation resulting from the impairment(s)," using what is generally referenced as the "paragraph B" or "Part B'" criteria of the Listings. *Id.* at §§ 404.1520a(b)(2); 416.920a(b)(2).  Finally, the Commissioner must document application of the technique.  *Id.*  Listings generally include a set of medical findings referred to as "paragraph A criteria" or "Part A" criteria.  The following four functional areas are considered under Part "B" of the Listing at 12.04: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. *Id.* at 404.1520a(c)(3); 416.920a(c)(3); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00©.  If the Commissioner rates the degree of a claimant's limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the Commissioner generally concludes that the alleged impairment(s) is not severe, unless the evidence otherwise

14

indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1).

The Commissioner does not contest that ALJ failed to rate the degree of functional limitation resulting from Plaintiff's mental impairments, and failed to include a specific finding as to the degree of limitation in each of the four broad functional areas.  However, the Commissioner contends those failures were harmless error, and again cites the Tenth Circuit's unpublished Order and Judgment in *Stokes* as support for that contention.  The *Stokes* decision acknowledged the ALJ's failure to rate the degree of functional limitation and make specific findings as to the degree of limitation in each functional area was "error," but it rationalized that "the ALJ's failure to properly utilize the 'special technique' at step three was harmless error."  2008 WL 1766788 at **6.

According to the Commissioner, the "special technique" was developed to help adjudicators at each stage of the administrative process to "consider and evaluate functional consequences of the mental disorder(s) relevant to [the] ability to work" and to "organize and present our findings in a clear, concise and consistent manner." 20 C.F.R. §§ 404.1520a(a)(2)(3); 416.920a(a)(2)(3).[7/]  The Commissioner thus directs a progressive consideration in  the use of the "special technique" in assessing the severity of mental impairments at Steps Two through Five of the sequential evaluation process.

Rating the degree of functional limitation in each of the four broad functional areas at Step Two enables the agency adjudicator to assess whether a particular mental

---

[7/]   The Commissioner further notes that the "special technique" was developed "to ensure that we obtain, consider, and properly evaluate all the evidence we need to evaluate impairment severity in claims involving mental impairment(s)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(I).

impairment is severe or non-severe.  Here, the ALJ determined at Step Two that there were "medical findings of . . . depression, anxiety, bipolar disorder, [and] substance abuse . . . which could place substantial limitation . . . upon [Plaintiff's] basic work activities."  [R. 22]. The ALJ did not indicate what those "medical findings" were, and thus failed to "specify the symptoms, signs and laboratory findings" he relied upon in making his Step Two determination of severity.  Additionally, as previously noted, the ALJ failed to address Dr. Hickman's diagnosis of an additional mental impairment, a pain disorder with psychological factors and a general medical condition, in his Step Two severity analysis.        In Social Security Ruling 96-8p, the Commissioner reminds the ALJ that the required ratings in the four areas of work-related functioning made at Step Two "are not an RFC assessment" as "the mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the [four] broad categories" of mental work-related functioning."  *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p at *4 (S.S.A. July 2, 1996).  The Commissioner thus indicates his expectation of some correlation, i.e., consistency, between the functional limitations assessed at Step Two, the ratings the ALJ makes in the four broad areas of functioning, and the subsequent, more detailed limitations the ALJ includes in his RFC assessment.[8/]  When, as here, the ALJ fails to generally indicate the functional limitations he evaluated at Step Two with the required ratings in the

_____

[8/]   The Commissioner also notes that the assessment of RFC "complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when your impairment is severe but neither meets nor is equivalent in severity to a listed mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

four broad areas of mental functioning, the Court lacks the ability to correlate those ratings with the more detailed limitations it reviews at Steps Four and Five.  The ALJ here gave "mental restrictions" in his RFC assessment of "simple, repetitive and routine work and limited contact with the public, coworkers and supervisors" [R. 23], but the Court has no ability to compare the consistency of those restrictions because the ALJ failed to set forth his evaluation of the evidence and the ratings of severity he made at Steps Two and Three. Of the four mental impairments that the ALJ listed as having "medical findings" at Step Two, the Court cannot determine to which specific impairment or impairments the ALJ attributed his mental RFC restrictions, and whether he did so based on the separate, or combined, effects of each mental impairment he listed at Step Two.  The Court thus cannot assess whether substantial evidence supports the ALJ's determination of mental restrictions in his RFC assessment.

The Commissioner's goals of clarity and consistency in the use of the "special technique" similarly were not met when, at Step Three, the ALJ further failed to clarify which of Plaintiff's four mentioned mental impairments he considered, in stating that he had "placed special emphasis on section[ ] . . . 12.00." [R. 22].   The ALJ failed to identify the specific listings he considered for either the individual, or combined, four mental impairments, in making that conclusion.

The *Stokes* decision relied on the Tenth Circuit's decision in *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2004), for finding the harmless error analysis

> may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Stokes*, 2008 WL 1766788 at **3 (quoting *Fischer-Ross*, 431 F.3d at 733-34)).  The facts in *Fischer-Ross* are distinguishable from those in the present case.  The claimant in *Fischer-Ross* had three distinct physical impairments, involving different categories of Listed impairments. The ALJ's RFC assessment in that case presented limitations, each of which could be clearly related to one of the three different impairments.  *Id.* at 731-32. Here, however, in addition to "medical findings" of several physical impairments, the ALJ noted "findings" of four mental impairments at Step Two.  At Step Three, the ALJ provided only the "bare conclusion"[9/] that he placed "specific emphasis" upon section[ ] . . . 12.00." [R. 22].  The ALJ did not identify the pertinent Listed mental impairments he compared with the symptoms and functional effects of those four mental impairments, either singly or in combination with one another. Unlike the RFC limitations in *Fischer-Ross* which could be linked to a specific impairment, the ALJ's RFC restrictions to simple work and limited contact with others cannot be apportioned to one or more of the four mental impairments, based on the record before this Court.   In *Stokes*, the claimant had three mental impairments, but the Court was able to relate the ALJ's RFC restriction to "simple work" to evidence suggesting  "marked" difficulties in maintaining concentration, persistence and pace.  *See*, 2008 WL 1766788 at **4.   In this case, the Court is not able to make a similar correlation between the ALJ's RFC mental restrictions and the evidence, particularly when

---

[9/]   In *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996), the Tenth Circuit found the ALJ "did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings."  The Court found the ALJ "merely stated a summary conclusion" that the claimant's impairments did not meet a Listing, and held that "[s]uch a bare conclusion is beyond meaningful judicial review."  The Court further noted that "[i]n the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed impairment." *Id.* at 1009.

the ALJ appears to have relied on the medical expert's testimony of limitations, but without any reference to the specific mental impairment being discussed. [R. 785-87].

The Commissioner recognizes,

Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

20 C.F.R. §§ 404.1520a(c)(1); 416.920a(c)(1).   The Court believes that the ALJ is better situated to undertake that "individualized process" of assessing mental functional limitations in the claims before him.  In *Fischer-Ross*, the Tenth Circuit acknowledged that the Court "appl[ies] harmless error analysis cautiously in the administrative review setting." 431 F.3d at 733.  That cautious approach appears to be the better choice in the instant case, where the Court has already determined to reverse the ALJ's decision.  On remand, the ALJ shall comply with the Commissioner's regulations and apply the "special technique" to all of Plaintiff's medically determinable mental impairments.

**C.      The ALJ's Failure to Develop the Record**

Plaintiff alleges that the ALJ failed to develop the record when he failed to subpoena missing records from one of Plaintiff's treating physicians, and failed to obtain a promised blood test for arthritis.   Part of this alleged failure, however, can be attributed to the situation in Plaintiff's case, where her first attorney failed to attend her scheduled hearing, and the ALJ continued that hearing, after ordering additional medical tests and

examinations, including the blood tests for arthritis.[10/]   [R. 703].   Plaintiff retained her present counsel to represent her at her two subsequent hearings, at which a different ALJ presided. [R. 709].

"[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored" and "the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Hawkins v. Chater*, 113 F.3d 1152, 1169 (10th Cir. 1997).  At Plaintiff's second hearing, her attorney did not draw the ALJ's attention to the missing treating physician records, or the previous ALJ's promise to conduct medical tests. At the third hearing, where Plaintiff was represented by another attorney in the same law practice, that attorney also did not raise the issue of the missing records or unperformed medical tests.  However, the attorney did remind the ALJ of Plaintiff's request for another consultative examination and knee x-rays, which the ALJ granted at the end of the third hearing. [R. 758].  From that, it is reasonable to expect that the ALJ would have taken some action, or made some responsive ruling, if the attorney had reminded him of tests that the previous ALJ had requested, but which had not been performed.  While this case presents a unique situation of a different ALJ at the second and third hearings and different attorneys at the second and third hearings,

---

[10/]   The first ALJ stated that he would have Plaintiff scheduled for additional medical tests, stating that he would ask for 'blood chemistry [tests] to include sedimentation or SED rate[,] ANA panel [, and] testing for the rheumatoid arthritic factor." [R. 703]. "Blood tests are useful in diagnosing some specific types of arthritis" and an elevated ESR "suggests inflammatory disease."  *The Merck Manual* 414 (17th Ed. 1999).  As Plaintiff points out, she had a blood test performed on July 23, 2003, which showed an elevated sedimentation rate (ESR) of 42. [R. 145].

Plaintiff's counsel still bears the responsibility to identify the areas in which promised development has not occurred, and bring that issue to the ALJ's attention in a timely manner.

Additionally, Plaintiff has not alleged how she has been affected by the failure of the Commissioner to follow through on the promised blood tests.  She acknowledges that she has had one blood test in 2003 that revealed an elevated sedimentation rate. [R. 145].  However,  Dr. Reddy diagnosed Plaintiff with osteoarthritis in her knees based on x-rays [R. 600, 603],  and gave her limitations in postural activities based on a combination of her osteoarthritis and obesity. [R. 609].   Although the ALJ could have been more medically precise in referring to Plaintiff's "pain in hands, wrists, neck back, knees, feet, shoulder and legs" as part of a "severe" impairment at Step Two, the ALJ noted Dr. Reddy's knee osteoarthritis diagnosis and x-ray evidence of Plaintiff's shoulders and knees in his decision. [R. 24]. The ALJ essentially adopted Dr. Reddy's physical RFC assessment, which identified Plaintiff's osteoarthritis and obesity as the cause for certain limitations. [R. 20, 609].  No physician treating or examining Plaintiff expressed the need for such blood tests as a conclusive indicator of another, separate impairment.  Plaintiff does not allege that the unperformed blood tests would be significant in changing Dr. Reddy's diagnosis of osteoarthritis and his limitations, or the ALJ's limitations in her RFC assessment.  The Court is not persuaded that the unperformed blood tests have deprived Plaintiff of evidence that is significantly probative and/or different from that in the present medical record.  The Court does not agree that the ALJ failed to develop the record in this regard.

Social Security regulations require the claimant to "bring to our attention everything that shows that you are . . . disabled" and "furnish medical and other evidence that we can

use to reach conclusions about your medical impairments."   20 C.F.R. §404.1512(c).  The regulations also state that "[p]arties to a hearing who wish to subpoena documents . . . must file a written request for the issuance of a subpoena with the administrative law judge . . .  at least 5 days before the hearing date," and specify the documents to be obtained, and the names and addresses to which the subpoena is to be served.  20 C.F.R. § 404. 950(d)(2).   The record does not show Plaintiff's counsel submitted any request for a subpoena for records to the ALJ.  Here, again, Plaintiff's counsel had two opportunities to request a subpoena for the missing documents at the two hearings before the ALJ, and failed to do so.

**D.      The ALJ's Step Five and Credibility Conclusions**

Because the Court has determined that remand of the ALJ's decision is necessary, the Court will not address Plaintiff's allegations of error at Step Five and in the ALJ's credibility determination, recognizing that those findings may be affected when the ALJ makes the required Step Two and Three determinations on remand.  For purposes of evaluating Plaintiff's credibility on remand, however, the Court directs the ALJ's attention to Social Security Ruling 96-7p, which requires consideration of "self-help" measures a claimant uses for relief of her symptoms.[11]  That consideration may be relevant in evaluating Plaintiff's occasional use of a cane for ambulation.[12]  *See*, *Policy Interpretation*

_____

[11]   Ruling 96-7p provides that, among the "kinds of evidence" the ALJ "must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements" are "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)."

[12]   Ruling 96-7p also reminds the ALJ that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain

*Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p, at *3, *5 (S.S.A. July 2, 1996).

## V.  CONCLUSION

The Commissioner's decision denying Plaintiff's application for Social Security benefits does not follow the correct legal principles and is not supported by substantial evidence.   Accordingly, the Court hereby reverses and remands the Commissioner's decision for further proceedings consistent with this opinion.

IT IS SO ORDERED this      day of September, 2008.

Sam A. Joyner
United States Magistrate Judge

---

why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms;" "the [ALJ] will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects." In his decision, the ALJ based a portion of his credibility finding upon perceived inconsistencies in Plaintiff's use of a cane for ambulation. [R. 25].  On remand, the ALJ may wish to further develop the record to learn Plaintiff's reasons for when she decides to use her cane.  *See Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (ALJ has a basic duty of inquiry "to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.")(citation omitted).